UNITED STATES BANKRUPTCY COURT

MIDDLE DISTRICT OF LOUISIANA

IN RE:

LOUIS ANTHONY SIRICO     CASE NO. 16-11028
LISA GRACE LOUD
     DEBTORS     CHAPTER 7

MARTIN SCHOTT, TRUSTEE
     PLAINTIFF

V.     ADV. NO. 17-1042

LOUIS ANTHONY SIRICO
LISA GRACE LOUD
     DEFENDANTS

**MEMORANDUM OPINION**

Chapter 7 trustee Martin Schott sued husband and wife co-debtors Louis Sirico and Lisa Loud to have their discharge denied under 11 U.S.C. §727(a)(4) for making false oaths or accounts based on omissions from their statement of financial affairs ("SOFA") and schedules.

The trustee's original[1] and amended and supplemental[2] complaints alleged four omissions from the debtors' original or amended SOFA and schedules:

(1) the sale of land and improvements at 285 Andsbury Avenue in Mountain View, California ("the Andsbury house") that yielded the debtors over $1,000,000;

(2) a Craigslist sale;

(3) a Wells Fargo bank account and related debit card through which Mr. Sirico allegedly received child support payments from his ex-wife; and

(4) an interest in 8.1 acres of real estate in New York State.[3]

---

[1] Original complaint [P-1].

[2] Amended and Supplemental Complaint [P-16].

This memorandum opinion explains the basis for denial of the debtors' discharge.

## I. FACTS

Loud and Sirico married in January 2015. They filed chapter 11 on September 12, 2016 and later voluntarily converted their case to chapter 7.[4] Martin Schott was appointed trustee.

Both debtors are well-educated: Ms. Loud holds a bachelor's degree in applied mathematics and Mr. Sirico, a degree in Information Systems Technology. Both are also experienced entrepreneurs. Loud ran a sole-proprietorship in California, Green Stay, before restructuring the business as Elf Homes, Inc. ("Elf"). The couple also invested in a Baton Rouge, Louisiana hotel in need of renovation through a limited liability company they formed, LL Hotels.

Sirico, who ran Elf after Loud found other employment, testified that Elf leased homes from local homeowners in Northern California and then furnished and re-let them as short-term rentals, usually to businesses whose employees' work brought them to Silicon Valley. Elf Homes ceased operations in late 2015 after Sunnyvale, California (where the business was based) prohibited short-term housing of the type Elf arranged. Elf's inability to re-let rented property after that ordinance was enacted left it without income to pay homeowners and led to suits against Elf for breach of contract.

The debtors' financial problems grew as they sought to renovate the Baton Rouge hotel. Dr. Michael Harbour and his limited liability company, Tasman Holdings, loaned LL Hotels money for the renovation project, which at some point stalled. Harbour and Tasman have filed proofs of claim in the debtors' case for $1,732,884.18 and $1,399,203.57, respectively. They

---

[3] The supplemental complaint alleged either that the debtors owned the property at the time of their petition and failed to disclose it, or else had failed to disclose the prepetition sale or transfer of the property. Amended and Supplemental Complaint [P-16]. ¶¶13, 14.

[4] P-129.

also have sued for a declaration that the debtors' debt on their personal guaranties of the hotel project loans are nondischargeable as having been obtained through false representations or actual fraud.[5]

### A. House Sale That Netted the Debtors over $1,000,000.

The most extraordinary of the debtors' omissions from their SOFA and schedules was the sale of the Andsbury house.[6] At an undetermined point Loud began to use the house as an Elf Homes rental but eventually sold it on March 19, 2015 for $2,060,333. The debtors received about $1,150,000 from that sale.[7] They used some of the proceeds to buy a home in Montreal, Canada, where Sirico moved after securing new employment. According to the debtors' testimony, they spent the remaining sales proceeds on legal fees and the couple's failing hotel renovation project in Baton Rouge.

The trustee discovered the sale while examining the couple's 2015 federal income tax return,[8] which was filed October 17, 2016, a month after their bankruptcy petition and just three days before the couple filed their original SOFA and schedules.[9]

Ms. Loud at trial admitted on cross examination by the trustee that the debtors had not disclosed the sale of the Andsbury house and the million-dollar net sales proceeds on their SOFA. At first she explained it as an accident, conceding that the transaction should have been listed. She claimed to have misremembered the date of the sale, believing it was outside the two-year window for which the SOFA sought information: "I recognize I evidently should have put

---

[5] *Harbour, et al. v. Sirico and Loud,* Adv. No. 17-1021. The court has not yet tried that claim.

[6] At one time Lisa Loud or her children lived in the home and at others, she rented out part of the property.

[7] Defendants' Trial Memorandum, P-28, p. 3.

[8] Trustee's exhibit no. 1.

[9] Ms. Loud testified that she had prepared the return that disclosed the sale in April 2016, but—as was her custom—obtained an extension for filing her taxes, so she did not print, sign and file the form until October.

'yes' here… I didn't intentionally hide it." But later in the trial, on direct examination by her lawyer, Loud changed her excuse for the omission. At that point she insisted that the sale was in the ordinary course of her business as a real estate investor and so the official forms did not require its disclosure.

Both debtors acknowledged their signatures under penalty of perjury on each iteration of their filings, affirming that the forms were true and correct even though the sale did not appear on the couple's original or amended SOFAs. With respect to their failure to disclose the sale on later amendments to the schedules and SOFA, both debtors testified that they only read the changed parts of the amended forms, rather than the entire forms.

### B.  The Debtors' Yard Sale Advertised on Craigslist.

Lisa Loud testified that in July 2016, as the debtors were preparing to move from California, she held a yard sale of second-hand books, toys and clothing. She advertised the sale through Craigslist, an internet classified advertisement website. She testified that the sale only netted about $25.00, most items selling for about $0.50. She further testified that she donated the unsold items to a charitable organization, Companion on the Journey.[10]

Ms. Loud admitted not disclosing the yard sale on the SOFA and schedules but explained at trial that she did not think something as small as the yard sale needed to be disclosed on the forms.

### C.  Failure to Disclose Child Support Payments.

The trustee's complaint alleges that the debtors failed to disclose a Wells Fargo account and debit card by which Mr. Sirico received child support payments on account of his minor daughter. Sirico testified that he occasionally receives child support from his ex-wife in varying

---

[10] Trustee's exhibit no. 6.

amounts garnished from her earnings by California authorities. On the date he filed chapter 11, the garnishments were being deposited into an account at Star One Credit Union, which was listed on the debtors' schedules and SOFA. Sirico testified that he has never received child support payments through a debit card. Further, no evidence was introduced to show the debtors had a Wells Fargo account or debit card that they failed to disclose.

But the evidence touched on another issue relating to child support. Sirico acknowledged at trial that the debtors' answers to SOFA question 5 concerning their receipt of child support were incorrect. The original SOFA, filed October 20, 2016, recited that the debtors received child support but omitted the amount of those payments. The debtors did not correct the SOFA until nearly a year later, at which point the debtors in combination disclosed their receipt of over $36,000 in child support for the period the SOFA covered.[11]

### D. Ownership of 8.1 Acres of Land in New York State.

The trustee also alleged, apparently based solely on an e-mail from Mr. Sirico to Dr. Harbour, that the debtors failed to disclose an ownership interest in 8.1 acres of land in New York State. Sirico's e-mail listed the couples' assets and included the statement "we own 8.1 acres of land in upstate New York." Sirico testified that the e-mail was part of a negotiation with Dr. Harbour regarding the guaranty for his loan for the Baton Rouge hotel project. Sirico was searching for new investors to replace one who had dropped out of the project.

Sirico testified that neither he nor Loud own any interest in land in New York and that his statement in the e-mail to Dr. Harbour was taken out of context. He explained that his mother owned the property along with an interest in a limited liability company that owned part of a subdivision.

---

[11] Main case no. 16-11028, P-154. Ms. Loud received $32,800.00 and Mr. Sirico, $3,271.00.

The trustee offered no direct evidence, apart from the e-mail, to support a finding that that the debtors owned any New York real estate before they filed bankruptcy.

### E.  Sales of Stock Disclosed on Tax Return.

From entries on the couple's 2015 federal income tax return, the trustee also identified eighty-four transactions in Lisa Loud's Charles Schwab account that did not appear on the debtors' schedules or SOFA.  According to the couple's tax return, the sales grossed $11,084.[12]

Loud acknowledged omitting the information but denied any intent to conceal the transactions.  She testified that she did not manage the account and that Turbo Tax, which she used to prepare the debtors' tax returns, automatically transferred all transaction information for the Schwab account into the data used in preparing the tax return.[13]

### II.  ANALYSIS

Bankruptcy Code section 727(a)(4)(A) commands courts to deny a discharge to debtors who knowingly and fraudulently make a false oath or account in, or in connection with, their case.

In order to prevail, the party seeking to deny a debtor's discharge must prove:

the debtor made a statement under oath;

the statement was false;

the debtor knew the statement was false;

the debtor made the statement with fraudulent intent; and

the statement related materially to the bankruptcy case.

*Matter of Pratt,* 411 F3d 561 (5th Cir. 2005).

---

[12] The debtors' tax return claimed an $840 net loss for the eighty-four sales.

[13] She also testified that she did not personally trade in the account; rather, her financial advisor had complete discretion and control over securities sales.  Loud only claimed to check her annual statements for the rate of return on the account.

The trustee as plaintiff has the burden of proving the elements of an objection to discharge under section 727 by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279 (1991)(*dicta*); *see also Swift v. Bank of San Antonio* (*Matter of Swift*), 3 F.3d 929, n.1 (5th Cir. 1993); *Beaubouef v. Beaubouef* (*Matter of Beaubouef*), 966 F.2d 174, 178 (5th Cir. 1992).

The requirement that a debtor fully disclose his finances facilitates the bankruptcy process of giving the honest but unfortunate debtor a fresh start. "Bankruptcy is a 'give-and-take process,' and for debtors to receive the benefits of the Code they must make 'complete disclosure to their creditors and the Trustee.'" *In re Hansen*, 325 B.R. 746, 761 (Bankr. N.D. Ill. 2005), quoting *Office of U.S. Trustee v. Zimmerman (In re Zimmerman),* 320 B.R. 800, 811 (Bankr. M.D. Pa. 2005). Further, "[t]he purpose of the requirement of filing a statement of financial affairs is to furnish the trustee and creditors with detailed information about the debtor's financial condition, thereby saving the expense of long and protracted examination for the purpose of soliciting the information." 4 COLLIER ON BANKRUPTCY ¶521.09 (Richard Levin & Henry J. Sommer eds., 16th ed.). Full disclosure is critical in bankruptcy because trustees do not have the resources to conduct in-depth reviews of every debtor.[14]

The trustee proved that the debtors failed to disclose information the SOFA called for.

### A. The Debtors Were Required to Disclose the Sale of the Andsbury House.

After Ms. Loud admitted on the trustee's cross-examination that the debtors should have disclosed the Andsbury house sale, the debtors for the first time offered evidence suggesting they believed that the form did not require them to disclose the Andsbury house sale because it was in the ordinary course of Lisa Loud's business as a real estate developer. The debtors rely on the

---

[14] *Carter-Jones Lumber Co. v. Beatty (In re Beatty)*, 583 B.R. 128, 139 (Bankr. N.D. Ohio 2018) ("A bankruptcy trustee has neither the time nor the resources to conduct an in-depth review of each and every debtor, necessitating accurate initial disclosures as a key feature of the U.S. bankruptcy system.").

wording of SOFA Question No. 18: "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?"  Their argument is without merit.

Loud's testimony on both direct and cross-examination the morning of the trial underscored her belief that she was required to disclose the sale of the Andsbury house.  She repeatedly admitted that the debtors should have disclosed the sale:  "[It] didn't occur to me that that [*sic*] was what was meant by the question…I know that it should have and I realize that I filled it out incorrectly, but at the time [I completed the SOFA and schedules] I was not thinking about the sale of the house"; and "I recognize I evidently should have put 'yes' here [referring to the question on the SOFA requiring disclosure of the sale]….  I didn't intentionally hide it."  She also proffered an explanation that she'd forgotten the date of the sale and believed that it had occurred more than two years before the debtors filed bankruptcy.

The debtors' later rationalization that they had no duty to disclose the sale because it was in the ordinary course of Ms. Loud's business or financial affairs undermines the debtors' credibility and is implausible.

As important, the debtors never established that the sale of the Andsbury house was in the ordinary course of either debtor's financial affairs.  No evidence supported a finding that Mr. Sirico was in the business of buying and selling homes.  And as for Ms. Loud, the testimony proved only that at one time before the bankruptcy filing she had run a business that leased, furnished and sublet homes. [15]

---

[15] Ms. Loud's decision to use the Andsbury house in the Elf Homes enterprise did not render her a real estate investor nor did it render the sale of the property an ordinary course of business transaction, especially considering that some of the proceeds were used to support the couple's other business endeavor, LL Hotels.  *See Stamat v. Neary*, 635 F.3d 974, 981 (7th Cir. 2011) finding that debtors' refinancing second home and using the proceeds for both personal and business expenses was not in the ordinary course of business or financial affairs.

### B. The Debtors Are Not Entitled to a Discharge for Failure to Disclose the Sale of the Andsbury House.

The evidence established that the debtors did not disclose the sale of the Andsbury house on their SOFA and schedules.

#### *1. The Debtors Made False Statements Under Oath.*

Bankruptcy Code section 521 imposes duties on debtors, one of which is the duty to file "a statement of the debtor's financial affairs." 11 U.S.C. §521(a)(1)(B)(iii). Both the SOFA and the debtors' schedules must be signed and sworn under oath, affirmation or penalty of perjury that the statements made in them are correct.[16] The content of that filing is prescribed by Fed. R. Bankr. P. 1007 and the Official Forms promulgated by the Federal Judicial Conference. All the false statements alleged in the trustee's complaint relate to the debtors' SOFA and schedules.

The debtors both identified their signatures on the original and amended SOFA and schedules under oath at the trial.

The trustee has carried his burden on this element.

#### *2. The Debtors' Statements Were False and the Debtors Knew Their Statements Were False.*

Both debtors testified that they knew of the sale of the Andsbury house, though Ms. Loud testified that she misremembered the date of the sale when completing the SOFA, believing it outside the two-year prepetition period required for disclosure. Her preparation of the couple's 2015 federal income tax return incorporating details of the sale belies her self-serving testimony about the sale date. Ms. Loud knew from preparing the tax return that the house sold within two years before the bankruptcy filing. Her claim that she omitted the transaction from the SOFA

---

[16] Fed. R. Bankr. P. 1008. *See also Beaubouef v. Beaubouef (Matter of Beaubouef),* 966 F.2d 174, 178 (5th Cir. 1992) (false statement in or omission from a debtor's schedules justifies denial of discharge.)

because she'd forgotten the date of a sale from which the debtors received over $1,000,000 is not credible.

Both debtors admitted that their answer to question 18 in their original and amended SOFAs was incorrect. The evidence does not support the debtors' alternative claim that they did not need to disclose the sale of the house because it was in the ordinary course of Ms. Loud's business.

The instructions booklet accompanying Official Form 107[17] provides in relevant part:

> The forms for individuals use *you* and *Debtor 1* to refer to a debtor filing alone. A married couple may file a bankruptcy case together—called a *joint case*—and in joint cases, these forms use *you* to ask for information from both debtors. For example, if a form asks, "Do you own a car?" the answer would be *yes* if either debtor owns a car. When information is needed about the spouses separately, the forms use *Debtor 1* and *Debtor 2* to distinguish between them. In joint cases, one of the spouses must report information as *Debtor 1* and the other as *Debtor 2*. The same person must be *Debtor 1* in all of the forms.

(*Id*, pp. 2–3). Additionally, the instructions at the top of Official Form 107 read: "If two married people are filing together, both are equally responsible for supplying correct information." Although Sirico argues that this language means that he is only responsible for information pertaining to himself, the instructions are unambiguous in making both debtors responsible for full disclosure in a joint case.

The Fifth Circuit has held that marriage alone is not enough to impute one spouse's fraud to the other in the context of nondischargeability actions under 11 U.S.C. §523. *Allison v. Roberts (Matter of Allison)*, 960 F.2d 481, 485-6 (5th Cir. 1992); *see also Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa),* 258 B.R. 192, 198 (9th Cir. B.A.P. 2001) ("[T]he marital status alone does not create an agency relationship.") and *In re Tara of North Hills*, 116 B.R.

---

[17] Available for download with Official Form 107 from the United States Courts' website: http://www.uscourts.gov/sites/default/files/instructions_individuals_0.pdf.

455, 462 (E.D.N.C. 1989) ("[A] wife is not the agent of her husband strictly by force of the marital relationship.").  The Fifth Circuit's reasoning in *Allison* supports attributing the omissions to Sirico and denying both debtors' discharge on the facts here.

In contrast to the married debtors in *Allison*, Loud and Sirico together participated in at least two business endeavors—Elf Homes, Inc. and LL Hotels.  The facts here more closely resemble those of *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277 (5th Cir. 1992), where the court refused to render dischargeable a debt arising from an allegedly innocent spouse's personal guaranty when both spouses participated in the business partnerships that incurred the debt and the innocent spouse benefitted from her partner/husband's fraud.

The SOFA question regarding alienation of property within two years of filing bankruptcy calls on both debtors in joint cases to give a single accurate response.  Here, although marriage alone did not create an agency relationship between the two parties, full and accurate disclosure from both parties was a trade-off the couple made for the protection of the bankruptcy court.  Sirico testified that he knew about the sale of the Andsbury house and yet signed his original and amended SOFA and schedules under penalty of perjury representing that there had been no sale.  He cannot credibly claim now that he should not be responsible for the debtors' failure to disclose the sale of the house and acquisition of over $1 million in net proceeds; this is especially so considering the benefits he enjoyed as a direct result of that sale—the purchase of a home in Montreal, Canada, in which he and the family's children now reside, and funds used in the couple's failed Baton Rouge hotel project.

### *3. The Debtors Possessed Fraudulent Intent.*

The debtors' insistence that they did not intend to defraud the court or their creditors by omitting the Andsbury house sale from their filings does not dissipate ample circumstantial evidence of their bad intent.

"Circumstantial evidence may be used to prove fraudulent intent and the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."  *Cadle Co. v. Duncan (Matter of Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)(internal citations omitted).  "While a single, isolated instance of non-disclosure or improper disclosure *may* not support a finding of fraudulent intent, we find that the repeated nature of non-disclosures and improper disclosures made by the Appellant in his schedules and SOFA supports the bankruptcy court's finding of fraudulent intent."  *Protos v. Silver (In re Protos)*, 322 F. App'x 930, 933 (11th Cir. 2009) (emphasis in original).

The debtors' failure to disclose the sale of the Andsbury house in both their original and amended SOFAs coupled with their failure to disclose other items betrays a "reckless disregard" for the truth that warrants denial of their discharge under §727(a)(4).

### *a. The debtors knowingly failed to disclose child support payments.*

The trustee proved that both debtors knew that Mr. Sirico receives child support payments.  Mr. Sirico admitted under oath that he received support for his daughter and that the response on the couple's SOFA reporting $0 in child support benefits was incorrect.  Lisa Loud testified that she knew her husband received child support, though she stated that she didn't know how much he received.

In fact, the debtors' amended SOFA filed August 8, 2017[18] divulged that *both* debtors had withheld information about child support payments. The amended SOFA, filed nearly a year after the petition for relief, suddenly disclosed that the debtors had received over $36,000 in child support between January 1, 2016 and the date the amendment was filed.[19]

Debtors cannot "play fast and loose" in their schedules. They signed false schedules proclaiming under penalty of perjury that neither received child support payments. The trustee has proven that the debtors intended to conceal those child support payments.

> *b. The debtors knowingly failed to disclose $11,084 in stock transactions.*

The debtors also failed to disclose stock transactions the trustee discovered through examining their tax returns. These stock transactions did not appear on the couple's schedules or SOFA.

Ms. Loud testified that the sales were all in an account she maintained at Charles Schwab. Her unrefuted testimony was that Turbo Tax, the program she used to prepare the couple's federal tax returns, automatically imported the Schwab account sale data into her return.

Loud's lack of day-to-day management of the Charles Schwab account did not relieve her of the duty to disclose transactions called for by the SOFA and schedules. "Debtors must make full and complete disclosures on their bankruptcy schedules, and it is not up to a debtor to decide upon the relevance or value of assets or information before including it on his or her schedules." *Rutland v Petersen (In re Petersen)*, 323 B.R. 512, 517 (Bankr. N.D. Fla. 2005).

Nor does Ms. Loud's claim that she need not have disclosed the sales on the SOFA because the transactions were in the ordinary course of her business hold water. Ms. Loud's

---

[18] Main case no. 16-11028, P-154.

[19] Nor did the debtors ever explain the nearly one year delay in amending the SOFA and schedules to disclose their receipt of $36,071 in child support.

business is not buying and selling stock: she has worked for PayPal for some time in different capacities. No evidence supported a finding that any of Ms. Loud's positions involved the purchase or sale of securities.[20] Further, Loud did not disclose any salary or business income from the purchase and sale of stock on her schedules or SOFA, implicitly belying her claim that she was in the business of buying and selling stock.

The stock transactions in the Charles Schwab account were not in the ordinary course of the debtor's business and the debtors were required to disclose them to the trustee and their creditors.[21]

The circumstantial evidence surrounding Loud's and Sirico's omissions supports a finding that they fraudulently intended to conceal financial information from the trustee, the court and the couples' creditors. *See Porobil v. Autry (Matter of Porobil)*, 182 F.3d 915 (5th Cir. 1999) (debtors had fraudulent intent within the meaning of 11 U.S.C. §727(a)(4) when debtor's tax return showed income but income-producing assets were not listed on the debtor's schedules or SOFA); *AutoSource Capital, Inc. v. Traina (In re Traina)*, 501 B.R. 379, 386 (Bankr. N.D. Cal.

---

[20] *EPIC Aviation, LLC v. Phillips (In re Phillips)*, 418 B.R. 445, 463 (Bankr. M.D. Fla. 2009) ("While it may have been common for [the debtor-husband's] companies to lend money to each other, the ordinary course of the Debtor's business cannot be considered so broad as to encompass all transactions, however large, involving money. The Debtor was in the charter air business. While he may warrant the title entrepreneur, that title does not shield him from the obligation to disclose the large sums flowing in and out of his accounts. The failure to disclose these transfers in the Debtor's schedules and statements, in *any* way, was clearly a material omission.")

[21] *See Tow v. Henley (In re Henley)*, 480 B.R. 708 (Bankr. S.D. Tex. 2012) evaluating a similar claim by debtors with respect to unscheduled sales of jewelry, cars, trucks, motorcycles, and silk rugs and finding that the sales were not in the ordinary course of the debtors' business. ("Ms. Henley has never been a jewelry designer or owner of a jewelry sales business…As such, the Court does not find that the sale of the 2.75 carat wedding ring and Rolex watch were within the ordinary course of her business. Furthermore, Mr. Henley never testified that he was a car salesman…Moreover, even assuming [he was a car salesman], Mr. Henley's vehicle-flipping income should have been reported in response to item 2, 'Income other than from employment or operation of business.'"). *See also Dobin v. Lawrence (In re Lawrence)*, 2012 WL 71601 (Bankr. N.J. 2012) (finding that a father's transfer of 1,250 Disney Vacation Club points to his son in lieu of a raise for his work at the family's failing store was not in the ordinary course of the father's business or financial affairs and should have been disclosed on the parents' SOFA.)

2013) (experienced and sophisticated debtors' fraudulent intent proven by omissions relating to a carefully engineered real estate transaction that shielded their most significant asset.).

### 4. The Debtors' Omissions Were Material.

"[T]he materiality of an omission is not solely based on the value of the item omitted or whether it was detrimental to creditors. Rather, the statement need only 'bear [ ] a relationship to the bankrupt's business transactions or estate, or concern [ ] the discovery of assets, business dealings, or the existence and disposition of his property.'" *Cadle Co. v. Duncan (Matter of Duncan),* 562 F.3d 688, 695 (5th Cir. 2009), quoting *Chalik v. Moorefield* (*In re Chalik*), 748 F.2d 616, 617 (11th Cir.1984). The sale of the Andsbury house within two years before the debtors filed bankruptcy is material. It is unnecessary to speculate here whether the trustee could challenge the transaction or recover any of the proceeds; the debtors were required to disclose it to give the trustee and creditors the option to investigate the transaction and disposition of more than $1 million in proceeds.

The trustee has carried his burden of proof to show the debtors made a false oath or account within the meaning of 11 U.S.C. §727(a)(4)(A) when they failed to disclose the sale of the Andsbury house on their original or amended SOFAs.

### C. The Trustee Failed to Carry His Burden of Proof With Respect to Other Omissions.

The trustee also alleged the debtors made false oaths or accounts when they failed to disclose a Wells Fargo account, the yard sale they advertised on Craigslist and ownership of 8.1 acres of land in New York State. The trustee did not prove two of the omissions and the single item he did prove was not material and does not justify denial of the debtors' discharge.

### *1. The debtors did not fraudulently withhold information regarding the yard sale advertised on Craigslist.*

Lisa Loud admitted not disclosing a yard sale on the debtors' SOFA, though she maintained that she did not realize something so insignificant had to be disclosed to the court and creditors. Ms. Loud's undisputed testimony was that the sale of second-hand and other items of minimal value yielded around $25. The inconsequential value of items the debtors sold through Craigslist weighs against a finding that the debtors fraudulently intended to conceal the sale, which Ms. Loud eventually disclosed to the trustee.[22]

### *2. The trustee failed to prove the debtors withheld information regarding a Well Fargo account or debit card.*

The trustee also failed to prove that the debtors knowingly and fraudulently withheld information regarding a Wells Fargo account and debit card through which Mr. Sirico received child support payments. Mr. Sirico's undisputed testimony was that the State of California from time to time deposited sums garnished from his ex-wife's wages into a Star One Credit Union account. That account is listed on the debtors' original SOFA as was an account at TD Bank that Sirico later used for the same purpose. The trustee failed to prove that the debtors made a false statement regarding a Wells Fargo account or debit card.

### *3. The trustee failed to prove the debtors owned any interest in 8.1 acres of real estate in New York.*

The trustee offered no direct evidence proving that the debtors owned any interest in land in New York. The evidence established that Mr. Sirico's mother owns the real estate.

The trustee's complaint is dismissed as to these alleged omissions.

---

[22] *Stampley v. Schermer (In re Schermer)*, 2003 WL 24027471 (Bankr. M.D. La. 2003) (omitting assets of inconsequential value from the SOFA and schedules did not prove debtor's intent to defraud creditors or hide assets).

## IV. CONCLUSION

The debtors made a false oath or account within the meaning of 11 U.S.C. §727(a)(4)(A) by failing to disclose the sale of a residence that netted them over $1 million and so are not entitled to a discharge.

Baton Rouge, Louisiana, September 12, 2018.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE